# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| RALPH CARUSONE,<br>  Petitioner, | Case No. 1:16-cv-742 |
| vs. | Black, J.<br>Bowman, M.J. |
| WARDEN, NORTH CENTRAL<br>CORRECTIONAL INSTITUTION,<br>  Respondent. | **REPORT AND<br>RECOMMENDATION** |

Petitioner has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 with the assistance of counsel. (Doc. 1). This matter is before the Court on the petition, respondent's return of writ, and petitioner's reply. (Docs. 1, 10, 12).

## I.   PROCEDURAL HISTORY

In 2006, the Hamilton County, Ohio, grand jury returned an indictment against petitioner, charging him with one count of purposeful murder in violation of Ohio Rev. Code § 2903.02(A) and one count of felony murder in violation of Ohio Rev. Code § 2903.02(B). (Doc. 9, Ex. 5, Page ID 52-54). The predicate offense for the felony-murder charge was felonious assault. (*Id.*, at PageID 53). Petitioner pled not-guilty. (*Id.*, Ex. 6, at PageID 55). In 2007, a jury convicted petitioner of felony murder, but acquitted him of purposeful murder. (*Id.*, Ex. 15, at PageID 106-07). He was sentenced to a term of fifteen years of imprisonment. (*Id.*, Ex. 17, at PageID 110).

On December 10, 2008, the Ohio Court of Appeals affirmed petitioner's conviction and sentence on direct appeal, but remanded the case for correction of petitioner's judgment to properly reflect his jail-time credit.[1] (*Id.*, Ex. 21, at PageID 189-96). The Ohio Supreme Court denied further review on April 22, 2009. (*Id.*, Ex. 26, at PageID 243).

---
[1]The trial court entered a new order granting jail-time credit on January 23, 2009. (Doc. 9, Ex. 22, at PageID 197).

In the meantime, on April 8, 2009, petitioner, through his current habeas counsel, filed a "Motion to Properly Preserve all Physical Evidence." (*Id*., Ex. 27, at PageID 244-46). The trial court granted the motion on May 4, 2009. (*Id*., Ex. 28, at PageID 247). Counsel filed, on July 13, 2010, a "Motion for Release of Photographs" (*Id*., Ex. 29, at PageID 268), which the trial court granted on July 26, 2010 (*Id*., Ex. 30, at PageID 269).

On June 4, 2012, petitioner filed a "Motion for Leave to File Motion for New Trial" on the basis of newly discovered evidence (*id.*, Ex. 31, at PageID 270-83), which the trial court denied without an evidentiary hearing (*id*., Ex. 34, at PageID 388). On November 15, 2013, the Ohio Court of Appeals reversed the judgment of the trial court, finding that the trial court abused its discretion in denying leave to file a new-trial motion without a hearing. (*Id.*, Ex. 40, at PageID 434-49). The Ohio Supreme Court denied further review on March 26, 2014. (*Id.*, Ex. 43, at PageID 484).

On September 15, 2014, on remand and following a hearing, the trial court granted petitioner leave to file a motion for new trial. (*Id*., Ex. 46, at PageID 496). In the motion, filed on September 19, 2014, petitioner argued that he was actually innocent of felony murder based on evidence that he claimed the State had failed to disclose in violation of *Brady v. Maryland*, 272 U.S. 83 (1963), and other newly discovered evidence that he claimed was unavailable at trial. (*Id*., Ex. 47, at PageID 497-511). On December 10, 2014, the trial court denied the new-trial motion, finding that the evidence underlying the motion was not material under *Brady* and/or was available to petitioner before trial through due diligence. (*Id*., Ex. 50, at PageID 518-31).

On October 23, 2015, the Ohio Court of Appeals affirmed the trial court's denial of petitioner's motion for a new trial. (*Id*., Ex. 54, at PageID 586-97). The Ohio Court of Appeals determined that petitioner had not demonstrated either that he was actually innocent of felony

murder or that the undisclosed evidence "might reasonably be said to undermine confidence in the jury's verdict finding him guilty of felony murder." (*Id.*, at PageID 595-97). Petitioner unsuccessfully sought en banc consideration and reconsideration of the Ohio Court of Appeal's decision. (*Id.*, Ex. 60, at PageID 632-34). On May 18, 2016, the Ohio Supreme Court denied further review. (*Id.*, Ex. 64, at PageID 670).

In July 2016, petitioner commenced the instant habeas corpus action, asserting a single ground for relief:

> **THE STATE VIOLATED [PETITIONER'S] CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY WITHHOLDING EVIDENCE MATERIAL TO HIS INNOCENCE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS AS GUARANTEEED BY *BRADY*.**

(Doc. 1, at PageID 18).

Respondent opposes the petition, arguing that petitioner's claim fails on the merits and is barred by the statute of limitations. (Doc. 10, at PageID 2144-2160). For the reasons below, the Court finds that the petition should be **DENIED**.

## II.     FEDERAL HABEAS STANDARD

In this federal habeas case, the applicable standard of review governing the adjudication of the constitutional claim that was raised to and decided by the Ohio courts is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at

a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000)). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599-600 (quoting *Williams,* 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600. As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* [563] U.S. [170], 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . . . This is a "substantially higher threshold.". . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* [562] U.S. [86, 98-99], 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original). The Supreme Court has further held that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d). *See Johnson v. Williams*, 568 U.S. 289, 293 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete

bar on federal-court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 562 U.S. at 102. In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, 565 U.S. 34, 40 (2011); *cf. Otte,* 654 F.3d at 600 (citing *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision"). The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412); *see also White v. Woodall*, __ U.S. __, 134 S.Ct. 1697, 1702 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012) (internal citation and quotation marks omitted)) ("[C]learly established Federal law' for purposes of § 2254(d)(1) includes 'only the holdings, as opposed to the dicta, of this Court's decisions."). Decisions by lower courts are relevant only "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

5

## III. THE PETITION SHOULD BE DENIED.

In his sole claim for relief, petitioner asserts that the Ohio Court of Appeals erred when it found that undisclosed and newly discovered evidence was not material to the jury's verdict that petitioner "had caused [the victim, Derek] Rininger's death as the proximate result of either knowingly causing or attempting to cause him serious physical harm or knowingly causing or attempting to cause him physical harm by means of a deadly weapon." (Doc. 1, at PageID 18). Respondent counters that the claim should be denied because the Ohio Court of Appeals' decision involved a reasonable application of *Brady* and petitioner's claim is untimely. (Doc. 10, at PageID 2144-2160).

### A. Timeliness of the Petition

Respondent argues that the statute of limitations on petitioner's claim expired on July 28, 2010, one year after his judgment of conviction became final. (*See* Doc. 10, at PageID 2157 (citing 28 U.S.C. § 2244(d)(1)(A)). Petitioner does not dispute that his petition is untimely (*see* Doc. 12, at PageID 2176-77), but argues that he can establish cause and prejudice or a manifest miscarriage of justice sufficient to excuse his procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).

The statute of limitations on a *Brady* claim begins to run on the date the underlying facts are or could be discovered through due diligence. *Willis v. Jones*, 329 F. App'x 7, 16 (6th Cir. 2009). Suppression of evidence that prevents a petitioner from raising claims arising from that evidence in state court can establish cause for the default of claims arising from that evidence. *Hutchison v. Bell*, 303 F.3d 720, 741 (6th Cir. 2002); *Smith v. Bell*, 381 F. App'x 547, 552 (6th Cir. 2010), *vacated on other grounds sub nom. Smith v. Colson*, 132 S. Ct. 1790 (2012). Because "the requirements for showing cause and prejudice parallel the elements of the underlying *Brady* violation," *Hutchison*, 303 F.3d at 741, if petitioner is able to establish a *Brady*

violation, he necessarily overcomes the statute-of-limitations bar. *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014) (explaining that cause and prejudice parallel two components of a *Brady* claim, "with the suppression of the evidence constituting cause and the materiality of the evidence resulting in prejudice."). Accordingly, the Court will turn to the merits of petitioner's *Brady* claim.

### B. Merits of the Petition

To establish a *Brady* violation, the petitioner has the burden of demonstrating that (1) the prosecution suppressed evidence, either willfully or inadvertently; (2) the evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; and (3) the suppressed evidence is material to guilt or punishment. *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999); *Brady*, 373 U.S. at 87; *Carter v. Bell,* 218 F.3d 581, 601 (6th Cir. 2000).

Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985); *see also Strickler,* 527 U.S. at 280 (citing *Kyles v. Whitley,* 514 U.S. 419 (1995)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Bagley,* 473 U.S. at 682. The Supreme Court has emphasized that the materiality inquiry asks "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. When a defendant alleges that the state has failed to disclose several pieces of *Brady* evidence, the materiality of that evidence is determined by examining the "*cumulative* effect of all such evidence suppressed," *id*. at 421 (emphasis added), not merely by examining the impact of each piece of evidence in isolation, *id*. at 440-41. Further, "the issue of materiality for *Brady* purposes pertains only to the question of a

defendant's guilt or innocence, not to the issue of a defendant's ability or inability to prepare for trial." *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991) (citing *United States v. Agurs*, 427 U.S. 97, 112 n. 20 (1976)).

In affirming the trial court's denial of petitioner's motion for new trial, the Ohio Court of Appeals provided the following summary of the testimony leading to petitioner's conviction and of the proceedings leading to the denial of petitioner's motion for new trial:

> Th[e] evidence showed that [the victim, Derek] Rininger had, a few days before the altercation, stolen from the apartment of the mother of his children, Jennifer Kron, $500 belonging to Kron's roommate, Melinda Scalf. At Rininger's invitation, Kron, with Carusone in the front passenger seat and Scalf in the back seat, drove to Rininger's house to recover the money. As Kron pulled up across from Rininger's house, Rininger ran from the house to the passenger side of Kron's car and took a swing at Carusone, either through the open car window before Carusone got out of the car (as Scalf testified) or as Carusone got out of the car (as Kron testified). Neither Kron nor Scalf saw a weapon, but both men were bloody after a brief exchange of blows. When Carusone retreated to the car, Rininger ran to the driver's side and reached through the open window for Kron's car keys. With Kron between them, Carusone and Rininger again struggled, until Kron put the car in gear and drove away.
>
> {¶ 9} Rininger's next-door neighbor saw the two men struggling across the front seat of Kron's car, saw Kron drive away, and then saw Rininger run into and through to the back of his house, return to the front porch with a towel in his hands, and "jump[ ] off the side of the steps." A police officer and emergency medical personnel responded to Rininger's 911 call reporting that he had "just got stabbed." The police officer found Rininger next to the front porch, barely conscious, with a cell phone in one hand and a blood-soaked bath towel held to his abdomen with the other hand. A member of the emergency medical crew testified that he had observed "severe bleeding" from stab wounds to both the left inner arm and the chest, a weak pulse, and very shallow respirations, and that Rininger had not been responsive to either verbal or painful stimuli. Rininger went into cardiac arrest in the ambulance on the way to the hospital, where efforts to resuscitate him proved futile.
>
> {¶ 10} Meanwhile, Kron had driven Carusone to a friend's house. Jacob Carroll testified that he had been present when Carusone arrived, and that Carusone had appeared "distraught [and] wired," had burned his clothes, and had told Carroll, "I took care of business. I shanked him once." Carroll also testified that Carusone had, the night before, shown him a pocket knife with a six-inch blade that Carusone carried on his belt. At the hospital, a pocket knife bearing traces of Rininger's blood was recovered from the pocket of Rininger's bloody shorts.

8

{¶ 11} The deputy coroner testified that Rininger had stab wounds to his left inner arm and to the left side of his chest, and that he had blood in the pericardial sac, which the deputy coroner attributed to a "hole into the right side of the heart." The deputy coroner concluded that Rininger had "died as a result of a stab wound to the chest," administered with "[a] significant amount of force" to pass through the skin, the soft tissues of the chest, the cartilage of the lower rib cage, the pericardium, and then the heart.

{¶ 12} The toxicology report showed that Rininger had recently ingested alcohol, cocaine, marijuana, a tranquilizer, and an opiate analgesic. The defense presented at trial expert opinion testimony attributing Rininger's "turbulent" behavior to his recent ingestion of alcohol and drugs. But in the deputy coroner's opinion, those substances had not contributed to Rininger's death.

*The New–Trial Motion*

{¶ 13} In support of his motion for a new trial, Carusone offered the evidence presented at the hearing on his motion for leave to move for a new trial and other "newly discovered evidence." This evidence, he argued, served to undermine the credibility of the state's key witnesses and to discredit the evidence adduced at trial concerning the cause of death.

{¶ 14} *Credibility evidence.* Carusone supported his new-trial motion with "new evidence" in the form of an enhanced audio recording of Rininger's 911 call. The enhanced recording, [petitioner] asserted, showed that Rininger's brother had been present when the police officer found Rininger and, thus, undermined the credibility of Rininger's brother, who had testified at trial that he had arrived at the house after the ambulance had gone, and the credibility of the police officer, who had testified that when he found Rininger, no one else had been present who could have contaminated the crime scene.

{¶ 15} Carusone also offered newly discovered evidence concerning the competency of state's witness Jacob Carroll in the form of an affidavit made by a resident of the house where [petitioner] had been dropped off after his fight with Rininger. She averred that she, and not Carroll, had admitted Carusone to the house that night; that Carroll had not, as he had testified, been at the house when Carusone arrived; and that Carusone had been "upset crying" and had repeatedly said, "[H]e kept hitting me in the head." She also stated that she had made a taped statement to that effect when the police interviewed her. But her statement was not disclosed to the defense in discovery, and she was not called as a witness at Carusone's trial.

{¶ 16} Carroll testified at the hearing on the motion for leave that he could recall only "[b]its and pieces" of his trial testimony and the events to which he had testified, because he was a drug addict and had been, in those instances, under the influence of heroin. Carroll testified that he had seen Carusone in possession of a "small pocket knife," not a knife with a six-inch blade. And Carroll stated that he could not recall either hearing or testifying at trial to Carusone's alleged statement

9

after the altercation that he "took care of business" and "shank[ed]" someone. But Carroll could recall a conversation among Kron, Scalf, and Carusone before the altercation, indicating an intention to "fight" or "go get" Rininger.

{¶ 17} *Cause-of-death evidence*. Finally, Carusone offered newly discovered evidence concerning the cause of Rininger's death. This evidence was contained in the complete "run report" compiled by the emergency-medical personnel who had treated Rininger at the scene and on the way to the hospital; the complete report of Rininger's treatment at the hospital, including the report of the emergency-room physician who had treated Rininger; the opinion testimony of a pathology expert; and a news article that, [petitioner] insisted, showed that the deputy coroner had a "history of missing the cause of death due in part to not obtaining the [deceased's] full medical report."

{¶ 18} During discovery, the state had disclosed to the defense only the 8½by 11–inch views of the two-page, 8½by 14–inch emergency "run report" form. The disclosed portion of the run report, which indicated that Rininger had been bleeding only from his arm wound and had "flinched" in response to painful stimuli, contradicted the testimony of the emergency crew member presented at trial. In support of his new-trial motion, [petitioner] argued that the undisclosed portion of the report further undermined the emergency crew member's testimony, because it showed that he had neither treated nor transported Rininger.

{¶ 19} The state also disclosed in discovery only three of eight pages of the report detailing Rininger's treatment at the hospital. The disclosed pages of the report did not include the report made by the emergency-room physician. And the deputy coroner did not consider the emergency-room physician's report in reaching his opinion that Rininger had died as a consequence of a stab wound to the heart.

{¶ 20} Carusone's discovery of the emergency-room physician's report led him to pathology expert Thomas W. Young, M.D. Based on his review of the enhanced 911 call, the police reports, the hospital and emergency run reports, the toxicology and lab reports, and the trial testimony, Dr. Young concluded that the deputy coroner had been mistaken in the cause of death. According to Dr. Young, the deputy coroner's conclusion that Rininger had died from a stab wound to the heart did not "make any sense anatomically," because the medical records showed no damage to any organ between Rininger's chest wound and the wound to his heart. Also, Dr. Young asserted, blood loss from a stab wound to the heart would have rendered Rininger unconscious within a few minutes, thus precluding his run to and through his house. Moreover, Rininger was treated at the scene, in the ambulance, and at the hospital for bleeding from the wound to his arm and then for cardiac arrest; he was not treated for shock or for "anything [else] * * * involving a major vascular structure and blood loss." Finally, the injury to the heart that the deputy coroner had decided was a stab wound was, in Dr. Young's opinion, caused when a needle was inserted into the pericardial sac during pericardiocentesis, in an effort to resuscitate Rininger at the hospital.

{¶ 21} Dr. Young found that the evidence instead pointed to cardiac arrest as the cause of death. He heard in Rininger's 911 call "laborious [ ] * * * breathing," indicating "problems with heart function." Those problems were, in Dr. Young's opinion, "cause[d] * * * [by] the combined effects of multiple drugs and alcohol, and heavy stress and exertion. The two put together caused the heart to stop." Concerning the cause of Rininger's "stress," Dr. Young noted that the run report had "described * * * [n]o active bleeding * * * from the chest wound," and that the blood loss from the arm wound had not been so "significant" that it would have put Rininger into shock. But Dr. Young stated that "a person [can] basically collapse[ ] from a cardial arrest due to a struggle [or] fear," that "stab wounds can add to the stress of the situation," and that "stress can in this setting with all of the other things combined affect heart function."

{¶ 22} Finally, Carusone supported his new-trial motion with his trial counsel's testimony at the hearing on leave. Counsel testified that the defense had essentially pursued only a self-defense strategy, and that, had they known of the matters contained in the undisclosed and other newly discovered evidence, they could have refuted the state's evidence concerning cause of death and could have more effectively challenged the credibility of the state's witnesses.

(Doc. 9, Ex. 54, at PageID 589-95).[2]

Then, focusing its due-process analysis on *Brady*'s materiality prong, the state court concludes:

{¶ 24} Carusone was charged with purposeful murder and felony murder, with felonious assault as the predicate offense. The purposeful-murder charge required proof that Carusone had "caus[ed]" Rininger's death "purposely," that is, that Carusone had acted with the "specific intention" of causing Rininger's death. *See* R.C. 2903.02(A) and 2901.22(A). The felony-murder charge required proof that Carusone had "caus[ed]" Rininger's death "as the proximate result of * * * committing or attempting to commit" felonious assault. *See* R.C. 2903.02(B). The felonious-assault charge required proof that Carusone had acted not purposely, but "knowingly," that is, with an "aware[ness]" that his conduct would "probably cause" the proscribed result, *see* R.C. 2901.22(B), and that he had either "caus[ed] serious physical harm to" Rininger, or had "caus[ed] or attempt[ed] to cause physical harm to [him] * * * by means of a deadly weapon," that is, an "instrument capable of inflicting death" that was, in that instance, "use[d] as a weapon." *See* R.C. 2903.11 and 2923.11.

{¶ 25} By its verdicts finding Carusone not guilty of purposeful murder, but guilty of felony murder, the jury effectively found that he had caused Rininger's death,

---

[2]Under 28 U.S.C. § 2254(e)(1), a state court's findings of fact are presumed correct and may be rebutted by the petitioner only by clear and convincing evidence to the contrary. *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009). Petitioner has not rebutted this presumption.

11

but had not intended to kill him. The verdicts indicated a determination by the jury that Rininger's death had been the proximate result of Carusone either engaging in conduct that caused serious physical harm to Rininger, with an awareness that his conduct would probably cause serious physical harm, or using a deadly weapon to cause or attempt to cause Rininger physical harm, with an awareness that his use of that weapon would probably cause physical harm.

{¶ 26} The undisclosed and other newly discovered evidence offered in support of Carusone's motion for a new trial plainly discredits the deputy coroner's opinion testimony that the cause of Rininger's death was a stab wound to the heart. But that evidence and the evidence adduced at trial would also support findings that Carusone had gone to Rininger's house to fight him; that during the fight, Carusone had stabbed Rininger in the chest and arm with a pocket knife; that that knife, even without a six-inch blade, had, by its nature and use, constituted a deadly weapon; that the bleeding from Rininger's arm wound, while insufficient to cause death or shock, had been serious enough to require emergency-medical treatment; that the stab wounds to the chest and arm, sustained in the course of the struggle between Carusone and Rininger, had, in the words of Dr. Young, "add[ed] to the stress of the situation"; and that that "heavy stress and exertion," along with "the combined effects of multiple drugs and alcohol, * * * [had] together caused [Rininger's] heart to stop."

{¶ 27} Thus, the evidence not disclosed in discovery and the other newly discovered evidence offered in support of the new-trial motion, considered collectively and with the evidence adduced at trial, would support a finding, beyond a reasonable doubt, that Carusone had caused Rininger's death as the proximate result of either knowingly causing him serious physical harm or knowingly causing or attempting to cause him physical harm by means of a deadly weapon. It follows that Carusone failed to demonstrate his claim that he was innocent of the crime of felony murder. And because the undisclosed evidence could not be said to have been "material" in the sense that it might reasonably be said to undermine confidence in the jury's verdict finding him guilty of felony murder, Carusone failed to demonstrate that he had been denied a fair trial.

(*Id.* at PageID 595-97).

Petitioner contends that in affirming the denial of his motion for new trial, the Ohio Court of Appeals ignored clearly established law and required him to establish his innocence from the felony-murder charge in order to establish his *Brady* claim. (Doc. 1, at PageID 15-16). Petitioner bases this argument on the language in the state appellate court's decision that:

[T]he evidence not disclosed in discovery and the other newly discovered evidence offered in support of the new-trial motion, considered collectively and with the evidence adduced at trial, *would support a finding*, beyond a reasonable doubt, that

12

> Carusone had caused Rininger's death as the proximate result of either knowingly causing him serious physical harm or knowingly causing or attempting to cause him physical harm by means of a deadly weapon.

(Doc. 9, Ex. 54, at PageID 597 (emphasis added)). The *Brady* materiality standard turns on whether the withheld evidence could reasonably "put the whole case in such a different light as to undermine confidence in the verdict" and is not a "sufficiency of the evidence" test. *Kyles*, 514 U.S. at 435 & n.8. However, elsewhere in the decision, the Ohio Court of Appeals made clear that it was applying the correct standard. At the beginning of its analysis, the court correctly recited the reasonable probability standard. *Id*. at *1 (stating "the relevant inquiry is not whether a trial with the undisclosed evidence would have yielded a different verdict, but whether the evidence 'considered collectively,' 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'") (quoting *Kyles*, 514 U.S. at 434-45)). Further, the court ultimately found that petitioner had failed to establish a *Brady* violation because the undisclosed evidence "could not be said to have been 'material' in the sense that it might reasonably be said to undermine confidence in the jury's verdict finding him guilty of felony murder." *Id*. at * 6. *See also United States v. Wright*, 866 F.3d 899, 912 (8th Cir. 2017) (rejecting claim that the district court misapplied *Brady* materiality standard where the court used incorrect language in one section of opinion, but elsewhere recited correct standard and engaged in analysis supporting its finding).

Here, the Ohio Court of Appeals appropriately looked to the evidence adduced at trial as well as the undisclosed and newly discovered evidence and determined that the evidence, considered collectively, could not reasonably be said to undermine confidence in the jury's guilty verdict on the felony-murder charge. *See id*. at *5-6. In so finding, the Ohio Court of Appeals acknowledged that the undisclosed and newly discovered evidence discredited the State's evidence that Rininger died from a stab wound to the heart, that petitioner had a knife with a six-

13

inch blade, and, arguably, that petitioner admitted to "shank[ing]" Rininger. *Id*. at *3, *6. However, the Ohio Court of Appeals' decision also made clear that the undisclosed and newly discovered evidence did not undermine the evidence presented at trial that Rininger was stabbed, that the stab wounds contributed to his death, and that petitioner possessed a pocket knife. *Id*. Nor can it be said, as petitioner suggests, that the undisclosed and newly discovered evidence undermines the jury's finding that it was petitioner, as opposed to Jennifer Kron−the driver of the car that was involved in the altercation−who stabbed Rininger. (*See* Doc. 12, at PageID 2176 n. 51). Based on the Ohio Court of Appeals' factual findings, which are entitled to deference under 28 U.S.C. § 2254(e), it was petitioner, not Kron, who struggled with Rininger, both initially when Rininger approached the car in which petitioner was a passenger and later when Rininger reached through the driver's side window for the driver's keys. (*See* Doc. 9, Ex. 54, at PageID 590).

Moreover, by its verdict, the jury apparently rejected a similar suggestion by defense counsel at trial that Kron stabbed Rininger. (*See* Doc. 9-7, at PageID 1862) (containing portion of counsel's closing argument wherein counsel stated: "[W]here is the blood? [W]here is the blood? It's on the steering wheel; it's on the passenger side. Jennifer [Kron], did you stab Derek [Rininger]?"). Petitioner did not introduce any undisclosed or newly discovered evidence establishing that Kron had or used a knife during the altercation with Rininger. Petitioner's suggestion that a jury could find that Kron "had ample opportunity and motive for cutting Rininger as he reached in the driver's window and tried to grab her keys" (Doc. 12, at PageID 2176 n. 51) is merely speculative and thus insufficient to support a *Brady* violation. *See Henness v. Bagley*, 644 F.3d 308, 325-26 (6th Cir. 2011) (rejecting *Brady* claim based on speculation).

Accordingly, the undersigned concludes that petitioner has failed to show that the Ohio Court of Appeals' ruling on his *Brady* claim "was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.[3] Petitioner's claim is therefore either procedurally barred or without merit. Because the undersigned concludes that petitioner failed to establish that the Ohio Court of Appeals unreasonably denied his *Brady* claim based on *Brady*'s materiality prong, the undersigned does not reach respondent's alternative argument that the undisclosed material was available to petitioner before trial through due diligence. (*See* Doc. 10, at PageID 2151-53).

Accordingly, in sum, the undersigned concludes that petitioner is not entitled to habeas corpus relief on his sole claim for relief, alleging a *Brady* violation. (Doc. 1). The state court's adjudication of petitioner's *Brady* claim is neither contrary to nor involves an unreasonable application of clearly established federal law, as determined by the Supreme Court, and is based on a reasonable determination of the facts in light of the record of evidence.

**IT IS THEREFORE RECOMMENDED THAT:**

1. The petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should **ISSUE** with respect to petitioner's sole claim for relief, that the Ohio Court of Appeals erred when it found that undisclosed and newly discovered evidence was not material to the jury's verdict finding that petitioner "had caused [the victim's] death as the proximate result of either knowingly causing or attempting to cause him serious physical harm or knowingly causing or attempting to cause him physical harm by means of a deadly weapon." (*Id*. at PageID 18). Under the applicable two-part standard enunciated in *Slack*

---

[3]To the extent that petitioner asserts that the Ohio Court of Appeals unreasonably applied the *Brady* materiality standard, and in an abundance of caution, the Court has also reviewed the claim *de* novo, *see Panetti v. Quarterman*, 551 U.S. 930, 953 (6th Cir. 2007), and finds that it would reach the same result as the Ohio Court of Appeals.

*v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would "find it debatable whether this Court is correct in its procedural ruling" and whether the otherwise barred ground for relief states a "viable claim of the denial of a constitutional right" or is "adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 & n. 4 (1983); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

    3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and therefore **GRANT** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

                                *s/ Stephanie K. Bowman*
                                Stephanie K. Bowman
                                United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

RALPH CARUSONE,
    Petitioner,

vs.

WARDEN, NORTH CENTRAL
CORRECTIONAL INSTITUTION,
    Respondent.

Case No. 1:16-cv-742

Black, J.
Bowman, M.J.

## **NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).